UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHARLES MANSON,<br><br>*Defendant.* | Crim. No. 24-cr-226-9 (BAH) |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Charles Manson is an intelligent, caring, and committed partner and father. Unfortunately, he experienced incredible trauma and neglect as a child that left him to figure out alone how to survive in an environment awash with violence, drugs, and guns. Although he has made great strides to educate and improve himself, his path to recovery—like most people with early exposure to trauma and substance abuse—has not always been a straight line. However, Charles now stands before the Court having accepted responsibility for his conduct and ready to face the consequences.

The parties concur with probation that the Guidelines range is 160–210 months. Probation has submitted a recommendation of 175 months. Respectfully, the defense submits that the purposes of sentencing can be fully met with a Guidelines sentence of 160 months. This request balances the seriousness of the offenses with a recognition of Charles's horrific upbringing, personal struggles with substance addiction, efforts to educate and improve himself in and out of jail, and commitment to love and protect his family and escape the cycles of drugs and violence that have claimed the lives of his siblings. Adding more months to this serious and lengthy sentence would not further serve the purposes of sentencing in 18 U.S.C. § 3553(a).

## LEGAL STANDARDS

The fundamental requirement of a federal sentence is to be "sufficient, but not greater than necessary, to comply with the purposes" set forth in § 3553(a). Courts must consider ten factors when sentencing a defendant: (1) "the nature and circumstances of the offense"; (2) "the history and characteristics of the defendant"; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct; (5) the need to protect the public from further crimes of the defendant; (6) the need to provide the defendant with needed correctional treatment; (7) the kinds of sentences available; (8) the Sentencing Guidelines and policies; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to any victims of the offense. These requirements reflect the "uniform and constant federal judicial tradition of considering every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted).

## ANALYSIS

Charles Manson, 34, was born and raised in Washington, D.C. But "raised" is a misnomer. His childhood was a heartbreaking cauldron of violence, abuse, and neglect that required him to struggle mightily to raise himself and make himself better. The tragedies began before kindergarten. Both of his parents were addicted to alcohol or drugs, and his mother also struggled with schizophrenia and bipolar disorder. In this unstable environment, at age 5, Charles was sexually abused multiple times by his uncle. Instead of receiving counseling and care, as any child victim needs and deserves, he was effectively abandoned by his parents.

2

When Charles was 6, his father was imprisoned. With his mother unable to care for him, Charles was placed into a foster home. But "home" was also a misnomer. This was just the first of *ten* foster homes he would experience over the next nine years. Charles experienced so much neglect in these "homes" that at age 12, he fled home and lived on the streets for two months. The same year, Charles's first brother was murdered. A second brother would be murdered four years later. Around this time, at age 12, Charles began using marijuana daily.

At 13, Charles was diagnosed with depression, attention deficit hyperactivity disorder, and bipolar disorder. He received some treatment between the ages of 14 and 15 at the Psychiatric Institute of Washington (PIW) in Washington, DC. But at age 15, Charles stole someone's purse. This began a nearly constant series of interactions with the juvenile delinquency and criminal justice systems. He was arrested at ages 15, 16, 17, 18, and 20.

At age 18, on the cusp of adulthood, Charles fathered twins, a boy and a girl, with his girlfriend. They would welcome another son three years later. Charles was an involved father. However, with few marketable skills, and feeling the pressure of a growing family, Charles participated in an armed robbery at age 20 that resulted in a 14-year sentence. This sentence took Charles from a 20-year-old in 2011 to the 32-year-old man who walked out in 2023. Thus, after an unimaginably difficult and traumatic childhood, virtually all of Charles's adult life has been spent incarcerated.

The government correctly notes that Charles began selling drugs in the instant case just a short period after the completion of his sentence in 2023. But as anyone with experience knows, recovery seldom proceeds in a straight line. And even as he made wrong choices, Charles showed a commendable commitment to bettering himself. He completed 320 hours of educational programming in prison, of which 271 hours were in Pre-GED and Advanced GED classes. He earned

his GED on July 14, 2022. And, after completing his sentence, he obtained a heating, ventilation, and air conditioning (HVAC) license in 2024.

Charles also developed a loving and stable relationship with his supportive fiancée, Jasmine Bagley. Ms. Bagley has written movingly about Charles's kindness, loyalty, and generosity:

> Charles is kind, he is giving, loving and loyal. He is a provider and a protector, and goes out his way to make a person feel safe. Charles will do anything to make someone smile or laugh, without him even knowing the person. When you're having a bad day, Charles will lift you up in any way possible. Charles is very giving to people in need, sometimes too much! I would get on him sometimes but if he could help someone, he would. That's just the type of person he is. . . . Charles has been a pillar to the community, he always looks out for the kids and the elderly. No matter what's going on, Charles always tried to keep his spirits positive, and do what he thought was right.

Ex. 1. As someone who "actually was in the same household with Charles, [and] watched him go through good days and also the bad ones," *id.*, Ms. Bagley was open about the confusing nature of seeing Charles striving to better himself while still being caught in old patterns:

> When Charles got arrested, I was lost and confused. He was home, he went to classes, completed and obtained his type II and type III HVAC license. It was a moment to be proud of. He was trying to be a better man, he was trying to change his life, he was trying to do things the right way, I just don't know what went left.

*Id.* But as Ms. Bagley astutely observes, these patterns were rooted in a childhood he is still learning to leave behind, a childhood where he had to teach himself not only how to survive, but how to feel and love as a father and partner:

> Charles was always worried about everyone else, that he forgot to pour into himself. I feel like Charles was never guided properly, to be the man that he was destined to be. Every person in his life, who should have cared for, taught him, nurtured him and provided for him, failed him. Now there are no excuses because is a full grown man that knows right from wrong, but I also feel like the way he thinks came from being in the same situation over and over and not getting different results. They say they call that insanity, but that's also people leaving a young person to make decisions an adult should be making.

4

>Charles started getting in trouble with the law when was 9 or 10 if I'm not mistaken. THAT was when he needed help! He needed serious help and the adults in his life failed him. That started his road of destruction and that started him having a criminal record. Men never get the mental help they need, especially black men. They get thrown into these institutions and deemed a danger, but I want you to consider the hardships these men have to face. . . .
>
>Charles has been making decisions for himself since he was a child and some of them have not been the best. I guess he adapted to an environment that he should have been out of a long time ago. I feel like Charles is smart enough to understand the mistakes that he's made this go round and that there will always be consequences for actions that the law doesn't see fit. . . . Through all of his trials and tribulations he still turned out to be a really really good person at heart and we don't have too many of those people left.

*Id.*

This personal story—Charles's "history and characteristics"—does not excuse his conduct by any means. However, in the sentencing analysis here, it plays a fundamental analytical role. That is because all of the "negative" sentencing factors—the seriousness of the offense, the defendant's criminal history, the need to promote respect for the law, for just punishment, for deterrence, and for protection—are already reflected in the process of calculating the lengthy and serious Guidelines range of 160-210 months. What is *not* reflected in that number is a defendant's life story. There is no Guidelines reduction for horrific abuse. There is no "minus-2" for living in foster homes from the age of 6, for seeing both parents consumed by drugs, for seeing two brothers murdered, for running away at 12, for needing daily marijuana use as a preteen. There is no "minus-3" for getting a GED and a trade license, for working hard to overcome the demons of such a childhood, for being involved in children's lives, for showing care and tenderness to a partner who supports him today.

The defense does not ask—and cannot ask—for a below-Guidelines sentence here. We simply ask for the low end of the Guidelines range to reflect what the Guidelines do not capture. Charles's conduct has demonstrated society's need to incarcerate him both to protect the public and, hopefully,

5

to deter him from conduct the next time he gets out. But 160 months—over 13 years—is no slap on the wrist. It reflects consecutive sentencing. It reflects mandatory minimums. It will carry Charles into his late 40s, where he will leave with the tools to become gainfully employed after an entire adulthood spent incarcerated. It is, in the words of the sentencing statute, "sufficient, but not greater than necessary." § 3553(a).

Moreover, incarcerating Charles for an additional 15 to 50 months in his late 40s, at taxpayer expense, has little prospect or track record of furthering the goals of sentencing. It has been conclusively shown that it is "the certainty of being caught," not the marginal length of sentencing, that deters criminal conduct. National Institute of Justice, Five Things about Deterrence, at 1 (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf ("Increasing the severity of punishment does little to deter crime."). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006). As such, it is strange that the government did not arrest Charles in the fall of 2023, when he made his first controlled sale. That would have demonstrated the certainty of getting caught at a time when he was under supervision and could have received punishment and revocation. That would have protected the public not only from further sales, but from the shooting in March 2024. Yet instead of arrest, the government kept adding controlled purchases to the tally, increasing the quantity for the Guidelines instead of helping to further the goals of protecting the public and demonstrating certainty to the offender. Whatever its reasons, using that additional quantity now to argue for a higher sentence has no basis in the logic or science of deterrence.

Excluding these additional months, on the other hand, would help fight recidivism. Studies reveal that offenders who are sentenced to long periods of incarceration are more likely to reoffend, not less. "When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7 (2010). This science-based approach is the most faithful way to balance Congress's imperative to balance society's legitimate needs with the unique history and characteristics of offenders like Charles, who has both a history of trauma and the hard-earned skills to leave the system and obtain gainful employment and support his family. As these studies demonstrate, it is actually counterproductive to society's interests to presume that long prison sentences provide deterrence and protect society from future crimes—the opposite is true in most cases, and certainly true here. Rather, to the extent possible, the shorter the sentence, the better the outcome for deterrence, recidivism, and rehabilitation.

Rather than adding more time to a custodial sentence that social science suggests will do nothing, the Court would do better to look at options for supervision and treatment, as commanded by the sentencing statute. Given Charles's truly horrific childhood, awash in drugs and full of neglect, and given the verdict of social science on what truly meets the goals of sentencing, it would more faithfully follow the dictates of § 3355 to focus on the supervision that will come after incarceration. Supervision, drug testing, drug treatment, and mandatory employment are tools can ensure that Charles never again appears for another sentencing, that the cross-generational cycles that have

coursed through hi life are broken by positive steps he has taken and can continue to take. An extra 15 to 50 months in prison at the end of a 13-year sentence, by contrast, will be as unlikely to break and heal these cycles as the first 14-year sentence that Charles served.

In sum, while the Guidelines range of 160 to 210 months reflects the seriousness of the offense, the need to protect the public, and the need for just punishment, the § 3553(a) factors that do *not* enter into the Guidelines calculus—such as Charles's history of trauma, educational attainments, and need for treatment and supervision—strongly support choosing the low end of that Guidelines range.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests a sentence of 160 months.

June 17, 2025                                      Respectfully submitted,

/s/ Matthew J. Peed .
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)
(202) 587-5610 (fax)

*Counsel for Defendant Charles Manson*